**GILBERT B. ABRAMSON & ASSOCIATES, LLC**
DENNIS L. ABRAMSON, ESQUIRE
ATTORNEY I.D. NO. DA5695
Attorney for Plaintiff
The Widener Building, Suite 510
1339 Chestnut Street
Philadelphia, PA 19107
(215) 988-7205

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **DANIEL T. FITZGERALD,** | : | |
| **individually, and derivatively,** | : | |
| **on behalf of the shareholders of** | : | |
| **METACOM CORPORATION** | : | |
| **a/k/a METACOM TECHNOLOGIES, INC.** | : | |
| | : | |
| **v.** | : | |
| | : | **CIVIL ACTION NO.** |
| **TODD MICHAEL COHAN** | : | |
| | : | |
| **And** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **METACOM CORPORATION,** | : | |
| **a/k/a** | : | |
| **METACOM TECHNOLOGIES, INC.** | : | |

## COMPLAINT

1.      Plaintiff, DANIEL T. FITZGERALD ("Fitzgerald"), is an adult citizen of

the state of Delaware, with a place of residence at 155 Devonshire Road, Wilmington,

Delaware 19803.   Pursuant to Federal Rule of Civil Procedure 23.1, Fitzgerald sues both

individually and derivatively, on behalf of the shareholders of Metacom Corporation

a/k/a Metacom Technologies, Inc.   The derivative claims are not a collusive action to

confer federal jurisdiction that would not otherwise exist.

1

2.     Defendant, TODD MICHAEL COHAN ("Cohan"), is an adult citizen of the state of New Jersey, with a place of business at 100 Bayard Street, New Brunswick, N.J. 08901.

3.     Defendant, METACOM CORPORATION a/k/a METACOM TECHNOLOGIES, INC. ("Metacom") is a corporation organized and existing under the laws of the state of New Jersey, with a place of business at 100 Bayard Street, New Brunswick, N.J. 08901. Metacom is engaged in the business of providing information technology, computer software, and related consulting and support services.

4.     Any demand on Metacom's Board of Directors to institute this action would have been futile because Defendant Cohan is Metacom's only Director and he committed the acts that are the subject of this suit. Therefore, he would have had to sue himself in order to properly prosecute this action. Despite Cohan's knowledge of the matters complained of herein, he has failed and refused to cease his wrongful conduct or to authorize redress therefor.

5.     Cohan was not independent or disinterested with respect to his misconduct set forth herein. Because he was the perpetrator of the wrongful conduct in question, he cannot exercise disinterested or independent business judgment in deciding, as Metacom's sole Director, whether to take appropriate legal action against the misconduct.

6.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, based upon the diverse citizenship of the parties and the amount in controversy which exceeds $75,000.00, exclusive of interest and costs.

7.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(a).

8.      At all times relevant hereto, Fitzgerald was an employee and 25% shareholder of Metacom.  See Fitzgerald's Employment Agreement with Metacom dated February 25, 2002 (Exhibit "A"), Fitzgerald's Employment Agreement with Metacom dated November 5, 2002 (Exhibit "B"), and Fitzgerald's Equity Interest Certificate in Metacom dated February 11, 2004 (Exhibit "C").

9.      At all times relevant hereto, Cohan was President, Chief Executive Officer, sole director, and 75% shareholder of Metacom.  As such, he owed a fiduciary duty of loyalty, good faith, and candor to Metacom and to Fitzgerald as a minority shareholder.

10.      Fitzgerald's governing Employment Agreement provides that he is entitled to, inter alia, "30% of the profit margin generated from his sales activity," and that the commission payments "shall be made to [Fitzgerald] within fifteen (15) days after the end of each month...."   (Exhibit "B" § 3.1(a) & (b).)

11.      Fitzgerald's Equity Interest Certificate provides that Fitzgerald was granted a 25% ownership interest in Metacom effective January 1, 2003, and that Metacom "will prepare and provide Daniel T. Fitzgerald audited financial statements annually, at a minimum."  (Exhibit "C.")

## COUNT I

### Fitzgerald, individually v. Cohan and Metacom

12.     Fitzgerald incorporates by reference the averments in paragraphs 1-11 above.

13.     From approximately January 2003 until the present, Cohan and Metacom have been breaching their fiduciary and contractual obligations to Fitzgerald in, inter alia, all of the following respects:

(a)     Despite Fitzgerald's repeated demands, Defendants have failed and refused to provide Fitzgerald with any audited financial statements, which Fitzgerald's Equity Interest Certificate requires annually, at a minimum;

(b)     Defendants have been depriving Fitzgerald of the commissions to which he entitled under Section 3.1 of his Employment Agreement of November 5, 2002;

(c)     Defendants deprived Fitzgerald of documents he needed to file his tax returns; and

(d)     Defendants are depriving Fitzgerald of the full value of his 25% ownership interest in Metacom, estimated to be in excess of $150,000.

14.     Defendants' conduct as set forth above is outrageous, malicious, willful, wanton, and in reckless disregard of Plaintiff's rights, such as to warrant an award of punitive damages.

WHEREFORE, Plaintiff demands: (a) a full accounting, through an independent auditor, of Metacom's assets, liabilities, revenues and expenses from January 2003 until the present; and (b) judgment against Defendants, jointly and severally, in an amount in

excess of $150,000.00 in compensatory damages and in excess of $150,000.00 in punitive damages.

## COUNT II

### Fitzgerald, individually and derivatively v. Cohan

15.     Fitzgerald incorporates by reference the averments in paragraphs 1-14 above.

16.     From approximately January 2003 until the present, Cohan has been breaching his fiduciary obligations to Metacom and its shareholders in, <u>inter alia</u>, all of the following respects:

(a)     Engaging in all of the conduct set forth in paragraph 13(a)-(d) above;

(b)     Devoting time and resources to other ventures and companies that compete against Metacom in providing information technology services, thus usurping corporate opportunities belonging to Metacom and diverting customers and revenues from Metacom;

(c)     Devoting minimal time and effort to his responsibilities as President, Chief Executive Officer, and director of Metacom;

(d)     Wasting corporate assets on payroll expenses for Cohan's live-in girlfriend who performs no services for Metacom;

(e)     Having financial statements prepared on the cash basis of accounting but, in the accountants' words, "elect[ing] to omit substantially all of the disclosures ordinarily included in financial statements prepared on" that basis;

(f)     Allowing or intentionally causing the issuance of Metacom financial statements and Metacom tax returns that are inconsistent and contradictory. Cohan produced this result by retaining one accounting firm to prepare Metacom's financial statements and a different accounting firm to prepare Metacom's tax returns, and, upon information and belief, providing different information and materials to the two different accounting firms;

(g)     Engaging in improper bookkeeping methods, such as recording incorrect or false dates for financial transactions, which has a damaging effect on minority shareholders and potential buyers of Metacom;

(h)     Refusing to provide prospective purchasers of Metacom with audited financial statements that the prospective purchasers require and demand as a condition to proceeding with the purchase, thus preventing the consummation of transactions that would be extremely profitable for Metacom and its shareholders.

17.     As a result of the above, Cohan has impaired the value of Metacom and therefore of Fitzgerald's interest in Metacom, has obscured and distorted Metacom's true financial condition, and has subjected Metacom to possible civil and criminal liability, all to the severe detriment of Fitzgerald and Metacom.

18.     Cohan's conduct as set forth above is outrageous, malicious, willful, wanton, and in reckless disregard of Plaintiff's rights, such as to warrant an award of punitive damages.

WHEREFORE, Plaintiff demands: (a) a full accounting, through an independent auditor, of Metacom's assets, liabilities, revenues and expenses from January 2003 until the present; and (b) judgment against Defendant Cohan in an amount in excess of

$150,000.00 in compensatory damages and in excess of $150,000.00 in punitive

damages.

GILBERT B. ABRAMSON & ASSOCIATES, LLC

BY: _Dennis L. Abramson_
DENNIS L. ABRAMSON, ESQUIRE
ATTORNEY I.D. NO. DA5695
Attorney for Plaintiff
The Widener Building, Suite 510
1339 Chestnut Street
Philadelphia, PA  19107
(215) 988-7205

DATE: _2/21/06_

7

# EXHIBIT "A"

## EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement") is made as of February 25, 2002 between Metacom Corporation, a New Jersey corporation (the "Employer") and Daniel T. Fitzgerald, an individual resident in Delaware (the "Executive").

## RECITALS

**WHEREAS**, Employer is engaged in the business of Enterprise Systems Management Solutions;

**WHEREAS**, Executive has experience in such business;

**WHEREAS**, it is the desire of the Employer to retain Executive as a Senior Account Executive of the Employer;

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

## 1. DEFINITIONS

For the purposes of this Agreement, unless otherwise defined herein the following terms have the meanings specified or referred to in this Section 1.

**"Agreement"**–this Employment Agreement, as amended from time to time.

**"Confidential Information"**–any and all:

(a) trade secrets concerning the business and affairs of the Employer, data, know-how and ideas, processes, past, current, and planned research and development, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer software and programs, computer software and database technologies and systems; and

(b) information concerning the business and affairs of the Employer (which includes historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, the names and backgrounds of key personnel, personnel training and techniques and materials), however documented; and

(c) notes, analysis, compilations, studies, summaries, and other material prepared by or for the Employer containing or based, in whole or in part, on any information included in the foregoing.

FROM :                          FAX NO. : 413 451 0380          May. 11 2005 03:43PM  P3

**"Employment Period"**--the term of the Executive's employment under this Agreement.

**"Fiscal Year"**--the Employer's fiscal year, as it exists on the date hereof or as changed from time to time.

**"person"**--any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, or governmental body.

**"Post-Employment Period"**--as defined in Section 8.2.

**"Proprietary Items"**--as defined in Section 7.2(A)(iv).


## 2. EMPLOYMENT TERMS AND DUTIES

**2.1 Employment**.  The Employer hereby employs the Executive, and the Executive hereby accepts employment by the Employer, upon the terms and conditions set forth in this Agreement.

**2.2 Term**.  Subject to the provisions of Section 6, the term of the Executive's employment under this Agreement will be for one year commencing on the date hereof. After the initial one year term and on each successive anniversary date thereof, this Agreement shall be automatically extended for an additional one year term unless either Executive or Employer notifies the other party of its desire to terminate this Agreement at least thirty (30) days prior to the immediately succeeding anniversary date.

**2.3 Duties**.  During the Employment Period, the Executive shall serve as a Sr. Technical Account Executive of the Employer and, in such capacity, shall render such managerial, administrative and other services as customarily are associated with and incident to such position, and as the Employer may, from time to time, reasonably require of him consistent with such position. The Executive will devote his entire business time, attention, skill, and energy to the business of the Employer. Nothing in this Section 2.3, however, will prevent the Executive from engaging in additional activities in connection with personal investments and community affairs that are not inconsistent with the Executive's duties under this Agreement.


## 3. COMPENSATION

### 3.1 Compensation

(A) Commission.   For the Employment Period, the Executive will be paid 30% of the profit margin generated from his sales activity.

2

(B) <u>Benefits.</u> The Executive will, during the Employment Period, be permitted to participate in such hospitalization, major medical, and other Section 125 employee benefit plans of the Employer that may be in effect from time to time for similarly situated employees, to the extent the Executive is eligible under the terms of those plans (collectively, the "Benefits"). As of the date hereof, such Benefits consist of the payment by Employee of 100% of the premiums of the Blue Cross Blue Shield HMO Blue plan.

<u>Costs</u> (used to determine margin amount)

- Wages and Bonuses
- Payroll Costs (Which include payroll taxes, employer insurance/bond expenses, standard vacation/sick/bench expenses – which are directly proportional to the pay rate)
- Benefits: Health, Tuition Reimbursement, 401k
- One-Time: Visa, Relocation, Vendor Commission, Etc.

(b) Commission Payments shall be made to Executive within fifteen (15) days after the end of each month during the term of this Agreement. Commission Payments shall be subject to required withholding for federal, state and local taxes.

(c) Each of the parties hereto acknowledges that the commission plan referenced in this Section 3.2 is an incentive plan established by Employer that is designed to motivate certain of its employees. To this end, Employer reserves the right to modify or otherwise alter the terms of such commission plan so as to achieve its maximum effectiveness and efficiency.

## 4. FACILITIES AND EXPENSES

The Employer will furnish the Executive office space, equipment, supplies, and such other facilities as is reasonably necessary or appropriate for the performance of the Executive's duties under this Agreement. The Executive must get approval for expenses with respect to any anticipated expenses incurred.

## 5. VACATIONS AND HOLIDAYS

Not applicable

## 6. TERMINATION

This Agreement may be terminated by either party, without cause, upon one (1) month written notice to the other party or at any time, by the Employer, for good cause, in which case all obligations of the Employer hereunder shall cease as of the date of such termination. For purposes

3

of this Agreement, "good cause" shall mean (a) Executive's death, (b) Executive shall become disabled and therefore unable to perform his duties and responsibilities hereunder for a period of thiry (30) consecutive days or sixty (60) days in any twelve month period (in determining whether or not Executive is disabled for the purposes of this paragraph, Executive's eligibility for benefits under any disability insurance policy shall be determinative, although other methods of determining disability may also be employed), (c) the Executive's material breach of this Agreement, (d) the Executive's failure to adhere to any written Employer policy if the Executive has been given a reasonable opportunity to comply with such policy or cure his failure to comply (which reasonable opportunity must be granted during the ten-day period preceding termination of this Agreement), (e) the appropriation (or attempted appropriation) of a material business opportunity of the Employer, including attempting to secure or securing any personal profit in connection with any transaction entered into on behalf of the Employer, (f) the misappropriation (or attempted misappropriation) of any of the Employer's funds or property, (g) neglect by Executive of his duties or (h) the conviction of, the indictment for (or its procedural equivalent), or the entering of a guilty plea or plea of no contest with respect to, a felony, the equivalent thereof, or any other crime with respect to which imprisonment is a possible punishment.

## 7. NON-DISCLOSURE COVENANT

    **7.1 Acknowledgements by the Executive** The Executive acknowledges that (a) during the Employment Period and as a part of his employment, the Executive will be afforded access to Confidential Information; (b) public disclosure of such Confidential Information could have an adverse effect on the Employer and its business; and (c) the provisions of this Section 7 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information.

    **7.2 Agreements of the Executive** In consideration of the compensation and benefits to be paid or provided to the Executive by the Employer under this Agreement, the Executive covenants as follows:

    (A) Confidentiality.

    (i) During and following the Employment Period, the Executive will hold in confidence the Confidential Information and will not disclose it to any person except with the specific prior written consent of the Employer or except as otherwise expressly permitted by the terms of this Agreement.

    (ii) Any trade secrets of the Employer will be entitled to all of the protections and benefits under applicable state trade secret law and any other applicable law. If any information that the Employer deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret for purposes of this Agreement, such information will, nevertheless, be considered Confidential Information for purposes of this Agreement. The Executive hereby waives any requirement that the Employer submit proof of the economic value of any trade secret or post a bond or other security.

(iii) None of the foregoing obligations and restrictions applies to any part of the Confidential Information that the Executive demonstrates was or became generally available to the public other than as a result of a disclosure by the Executive.

(iv) The Executive will not remove from the Employer's premises (except to the extent such removal is for purposes of the performance of the Executive's duties at home or while traveling, or except as otherwise specifically authorized by the Employer) any document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). The Executive recognizes that, as between the Employer and the Executive, all of the Proprietary Items, whether or not developed by the Executive, are the exclusive property of the Employer. Upon termination of this Agreement by either party, or upon the request of the Employer during the Employment Period, the Executive will return to the Employer all of the Proprietary Items in the Executive's possession or subject to the Executive's control, and the Executive shall not retain any copies, abstracts, sketches, or other physical embodiment of any of the Proprietary Items.

## 8. NON-COMPETITION AND NON-INTERFERENCE

**8.1 Acknowledgements by the Executive**  The Executive acknowledges that: (a) the services to be performed by him under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Employer's business is within the United States; (c) the Employer competes with other businesses that are or could be located in any part of the United States; and (d) the provisions of this Section 8 are reasonable and necessary to protect the Employer's business.

**8.2 Covenants of the Executive**  (a) In consideration of the acknowledgments by the Executive, and in consideration of the compensation and benefits to be paid or provided to the Executive by the Employer, the Executive covenants that he will not, directly or indirectly:

(i) during the Employment Period, except in the course of his employment hereunder, and during the Post-Employment Period, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend the Executive's name or any similar name to, lend Executive's credit to or render services or advice to, any business whose activities compete in whole or in part with the products or activities of the Employer; provided, however, that the Executive may purchase or otherwise acquire up to (but not more than) one percent of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934;

(ii) whether for the Executive's own account or for the account of any other person, at any time during the Employment Period and the Post-Employment Period, solicit business of the same or similar type being carried on by the Employer, from any person known by the Executive to be a customer of the Employer, whether or not the Executive had personal contact with such person during and by reason of the Executive's employment with the Employer;

(iii) whether for the Executive's own account or the account of any other person (i) at any time during the Employment Period and the Post-Employment Period, solicit, employ, or otherwise engage as an employee, independent contractor, or otherwise, any person who is or was an employee of the Employer at any time during the Employment Period or in any manner induce or attempt to induce any employee of the Employer to terminate his employment with the Employer; or (ii) at any time during the Employment Period and for three years thereafter, interfere with the Employer's relationship with any person, including any person who at any time during the Employment Period was an employee, contractor, supplier, or customer of the Employer; or

(iv) at any time during or after the Employment Period, disparage the Employer or any of its shareholders, directors, officers, employees, or agents.

(v) the common stock will be sold by the Executive back to the company for $1.00 in the event the Executive violates either the non-compete or confidential provisions of this agreement.

(b) Notwithstanding the provisions of Section 8.2(a), in the event that Employer terminates this Agreement without "good cause" (as such term is defined in Section 6 hereof), Executive shall be entitled to contact and engage in business with the clients of Employer that Executive had primary responsibility for.

(c) For purposes of this Section 8.2, the term "Post-Employment Period" means the one (1) year period beginning on the date of termination of the Executive's employment with the Employer.

(d) If any covenant in this Section 8.2 is held to be unreasonable, arbitrary, or against public policy, such covenant will be considered to be divisible with respect to scope, time, and geographic area, and such lesser scope, time, or geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding, and enforceable against the Executive.

(e) The period of time applicable to any covenant in this Section 8.2 will be extended by the duration of any violation by the Executive of such covenant.

6

'FROM :'  FAX NO. : 413 451 0380  May. 11 2005 03:46PM P8

## 9. GENERAL PROVISIONS

**9.1 Injunctive Relief and Additional Remedy**  The Executive acknowledges that the injury that would be suffered by the Employer as a result of a breach of the provisions of this Agreement (including any provision of Sections 7 and 8) would be irreparable and that an award of monetary damages to the Employer for such a breach would be an inadequate remedy. Consequently, the Employer will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement, and the Employer will not be obligated to post bond or other security in seeking such relief.

**9.2 Covenants of Sections 7 and 8**  The covenants by the Executive in Sections 7 and 8 are essential elements of this Agreement, and without the Executive's agreement to comply with such covenants Employer would not have entered into this Agreement or employed or continued the employment of the Executive.  If the Executive's employment hereunder expires or is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of the Executive in Sections 7 and 8.

**9.3 Representations and Warranties by the Executive**  The Executive represents and warrants to the Employer that the execution and delivery by the Executive of this Agreement do not, and the performance by the Executive of the Executive's obligations hereunder will not, with or without the giving of notice or the passage of time, or both: (a) violate any judgment, writ, injunction, or order of any court, arbitrator, or governmental agency applicable to the Executive; or (b) conflict with, result in the breach of any provisions of or the termination of, or constitute a default under, any agreement to which the Executive is a party or by which the Executive is or may be bound.

**9.4 Binding Effect; Delegation of Duties Prohibited**  This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective successors, assigns, heirs, and legal representatives, including any entity with which the Employer may merge or consolidate or to which all or substantially all of its assets may be transferred. The duties and covenants of the Executive under this Agreement, being personal, may not be delegated.

**9.5 Notices**  All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and facsimile numbers set forth below (or to such other addresses and facsimile numbers as a party may designate by notice to the other parties):

7

**If to Employer**:
Metacom Corporation
100 Bayard Street
Suite 410
New Brunswick, NJ 08901

**If to the Executive**:
Mr. Daniel T. Fitzgerald
155 Devonshire Road
Wilmington, DE 19803

**9.6 Entire Agreement; Amendments**   This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, between the parties hereto with respect to the subject matter hereof. This Agreement may not be amended orally, but only by an agreement in writing signed by the parties hereto.

**9.7 Governing Law**   This Agreement will be governed by the laws of the State of New Jersey.

**9.8 Section Headings, Construction**   The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement unless otherwise specified. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

**9.9 Severability**  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**9.10 Counterparts**  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the date above first written above.

**METACOM CORPORATION**

By:_____

Name:  Todd M. Cohan

Title:    President

**EXECUTIVE**

_____ 2/25/02

Daniel T. Fitzgerald        Date

# EXHIBIT "B"

# EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement") is made as of November 5, 2002 between Metacom Corporation, a New Jersey corporation (the "Employer") and Daniel T. Fitzgerald, an individual resident in Delaware (the "Executive").

## RECITALS

**WHEREAS,** Employer is engaged in the business of Enterprise Systems Management and Security Solutions;

**WHEREAS,** Executive has experience in such business;

**WHEREAS,** it is the desire of the Employer to retain Executive as a Senior Account Executive of the Employer;

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

## 1. DEFINITIONS

For the purposes of this Agreement, unless otherwise defined herein the following terms have the meanings specified or referred to in this Section 1.

**"Agreement"**--this Employment Agreement, as amended from time to time.

**"Confidential Information"**--any and all:

(a) trade secrets concerning the business and affairs of the Employer, data, know-how and ideas, processes, past, current, and planned research and development, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer software and programs, computer software and database technologies and systems; and

(b) information concerning the business and affairs of the Employer (which includes historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, the names and backgrounds of key personnel, personnel training and techniques and materials), however documented; and

(c) notes, analysis, compilations, studies, summaries, and other material prepared by or for the Employer containing or based, in whole or in part, on any information included in the foregoing.

**"Employment Period"**--the term of the Executive's employment under this Agreement.

**"Fiscal Year"**--the Employer's fiscal year, as it exists on the date hereof or as changed from time to time.

**"person"**--any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, or governmental body.

**"Post-Employment Period"**--as defined in Section 8.2.

**"Proprietary Items"**--as defined in Section 7.2(A)(iv).


## 2. EMPLOYMENT TERMS AND DUTIES

**2.1 Employment**. The Employer hereby employs the Executive, and the Executive hereby accepts employment by the Employer, upon the terms and conditions set forth in this Agreement.

**2.2 Term**. Subject to the provisions of Section 6, the term of the Executive's employment under this Agreement will be for one year commencing on the date hereof. After the initial one year term and on each successive anniversary date thereof, this Agreement shall be automatically extended for an additional one year term unless either Executive or Employer notifies the other party of its desire to terminate this Agreement at least thirty (30) days prior to the immediately succeeding anniversary date.

**2.3 Duties**. During the Employment Period, the Executive shall serve as a Sr. Technical Account Executive of the Employer and, in such capacity, shall render such managerial, administrative and other services as customarily are associated with and incident to such position, and as the Employer may, from time to time, reasonably require of him consistent with such position. The Executive will devote his entire business time, attention, skill, and energy to the business of the Employer. Nothing in this Section 2.3, however, will prevent the Executive from engaging in additional activities in connection with personal investments and community affairs that are not inconsistent with the Executive's duties under this Agreement.


## 3. COMPENSATION

### 3.1 Compensation

(A) Commission.   For the Employment Period, the Executive will be paid 30% of the profit margin generated from his sales activity.

(B) Benefits. The Executive will, during the Employment Period, be permitted to participate in such hospitalization, major medical, and other Section 125 employee

benefit plans of the Employer that may be in effect from time to time for similarly situated employees, to the extent the Executive is eligible under the terms of those plans (collectively, the "Benefits").  As of the date hereof, such Benefits consist of the payment by Employee of 100% of the premiums of the Blue Cross Blue Shield HMO Blue plan.

**Costs** (used to determine margin amount)

- Wages and Bonuses
- Payroll Costs (Which include payroll taxes, employer insurance/bond expenses, standard vacation/sick/bench expenses – which are directly proportional to the pay rate)
- Benefits: Health, Tuition Reimbursement, 401k
- One-Time: Visa, Relocation, Vendor Commission, Etc.

(b) Commission Payments shall be made to Executive within fifteen (15) days after the end of each month during the term of this Agreement.  Commission Payments shall be subject to required withholding for federal, state and local taxes.

(c) Each of the parties hereto acknowledges that the commission plan referenced in this Section 3.2 is an incentive plan established by Employer that is designed to motivate certain of its employees.  To this end, Employer reserves the right to modify or otherwise alter the terms of such commission plan so as to achieve its maximum effectiveness and efficiency.

**3.2 Equity Participation**

(A) <u>Performance Share Issuances</u>.  During the term ending December 31, 2002, Employer shall issue to Executive ten shares of Common Stock, (1% of the Metacom Common Stock) for each $100,000.00 of revenue generated in both services and software combined, (with a reasonable and acceptable profit margin by The Board of Directors). Notwithstanding the foregoing, in no event shall the Performance Shares issued hereunder exceed fifty, (50) shares or 5% of Common Stock in the aggregate. These shares will be vested at 33.33% per year, (Fully vested after 3 years), from the time of the issuance. (January 1, 2003)

If Executive terminates this Agreement or Employer terminates this   Agreement for good cause (as such term is defined in Section 6 hereof), in each case within twelve months of the date hereof, Executive agrees that the Employer may repurchase the Signing Bonus Shares for an aggregate purchase price of $1.00.  In the event of such repurchase, Executive agrees to deliver the Performance Shares to Employer, free and clear of any liens or other encumbrances, upon payment of the aforementioned purchase price.

3

(B) <u>IPO Purchase Rights</u>.  In the event that Employer undertakes an initial public offering of its Common Stock pursuant to a registration statement filed with the US Securities Exchange Commission (an "IPO") during the term hereof, Employer will use its best efforts to cause the underwriter managing such IPO to offer to sell to Executive such number of shares of Common Stock equal to the product of (x) the percentage of the then total outstanding common stock of Employer represented by the Compensation Shares times (y) the total number of shares of Common Stock to be offered in such IPO.  The purchase price for such shares of Common Stock offered for purchase to Executive will be the strike price of the stock at the IPO.

The Executive agrees that he will act in good faith and agree to adjustments to these Purchase Rights if the Underwriter refuses to represent and/or undertake the Initial Public Offering as a result of these Purchase Rights.  These Options need to be exercised within 90 days of termination of this Employment Agreement.

(C) <u>Stockholders Agreement</u>.  The parties hereto acknowledge that the Performance Shares shall be subject to a shareholders agreement to be entered into between the Employer and Executive as soon as practicable after the date hereof (the "Shareholders Agreement").  The Shareholders Agreement shall provide that the Employer shall have a right of first refusal to purchase the Performance Shares in the event that the Executive desires to transfer such shares.  The purchase price to the Employer with respect to the Performance Shares shall be the price that the bona fide good faith purchaser arising in connection with the proposed transfer would pay for such shares.  The Shareholders Agreement shall contain customary provisions and the parties agree to use good faith in negotiating and entering into such agreement.

(D) <u>Restrictive Legends</u>. Executive acknowledges that the Performance Shares will be "restricted securities" within the meaning of the rules and regulations promulgated under the Securities Act of 1933, as amended, and that the Performance Shares cannot be sold unless they are registered under the Securities Act of 1933, as amended, or unless an exemption from registration is available. Executive acknowledges that the certificates representing the Performance Shares will bear a legend indicating the restrictions on transfer referenced above.

## 4. FACILITIES AND EXPENSES

The Employer will furnish the Executive office space, equipment, supplies, and such other facilities as is reasonably necessary or appropriate for the performance of the Executive's duties under this Agreement. The Executive must get approval for expenses with respect to any anticipated expenses incurred.

4

## 5. VACATIONS AND HOLIDAYS

Not applicable

## 6. TERMINATION

This Agreement may be terminated by either party, without cause, upon one (1) month written notice to the other party or at any time, by the Employer, for good cause, in which case all obligations of the Employer hereunder shall cease as of the date of such termination. For purposes of this Agreement, "good cause" shall mean (a) Executive's death, (b) Executive shall become disabled and therefore unable to perform his duties and responsibilities hereunder for a period of thiry (30) consecutive days or sixty (60) days in any twelve month period (in determining whether or not Executive is disabled for the purposes of this paragraph, Executive's eligibility for benefits under any disability insurance policy shall be determinative, although other methods of determining disability may also be employed), (c) the Executive's material breach of this Agreement, (d) the Executive's failure to adhere to any written Employer policy if the Executive has been given a reasonable opportunity to comply with such policy or cure his failure to comply (which reasonable opportunity must be granted during the ten-day period preceding termination of this Agreement), (e) the appropriation (or attempted appropriation) of a material business opportunity of the Employer, including attempting to secure or securing any personal profit in connection with any transaction entered into on behalf of the Employer, (f) the misappropriation (or attempted misappropriation) of any of the Employer's funds or property, (g) neglect by Executive of his duties or (h) the conviction of, the indictment for (or its procedural equivalent), or the entering of a guilty plea or plea of no contest with respect to, a felony, the equivalent thereof, or any other crime with respect to which imprisonment is a possible punishment.

## 7. NON-DISCLOSURE COVENANT

**7.1 Acknowledgements by the Executive** The Executive acknowledges that (a) during the Employment Period and as a part of his employment, the Executive will be afforded access to Confidential Information; (b) public disclosure of such Confidential Information could have an adverse effect on the Employer and its business; and (c) the provisions of this Section 7 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information.

**7.2 Agreements of the Executive** In consideration of the compensation and benefits to be paid or provided to the Executive by the Employer under this Agreement, the Executive covenants as follows:

(A) Confidentiality.

(i) During and following the Employment Period, the Executive will hold in confidence the Confidential Information and will not disclose it to any person except with the specific

5

prior written consent of the Employer or except as otherwise expressly permitted by the terms of this Agreement.

(ii) Any trade secrets of the Employer will be entitled to all of the protections and benefits under applicable state trade secret law and any other applicable law. If any information that the Employer deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret for purposes of this Agreement, such information will, nevertheless, be considered Confidential Information for purposes of this Agreement. The Executive hereby waives any requirement that the Employer submit proof of the economic value of any trade secret or post a bond or other security.

(iii) None of the foregoing obligations and restrictions applies to any part of the Confidential Information that the Executive demonstrates was or became generally available to the public other than as a result of a disclosure by the Executive.

(iv) The Executive will not remove from the Employer's premises (except to the extent such removal is for purposes of the performance of the Executive's duties at home or while traveling, or except as otherwise specifically authorized by the Employer) any document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). The Executive recognizes that, as between the Employer and the Executive, all of the Proprietary Items, whether or not developed by the Executive, are the exclusive property of the Employer. Upon termination of this Agreement by either party, or upon the request of the Employer during the Employment Period, the Executive will return to the Employer all of the Proprietary Items in the Executive's possession or subject to the Executive's control, and the Executive shall not retain any copies, abstracts, sketches, or other physical embodiment of any of the Proprietary Items.

## 8. NON-COMPETITION AND NON-INTERFERENCE

**8.1 Acknowledgements by the Executive**  The Executive acknowledges that: (a) the services to be performed by him under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Employer's business is within the United States; (c) the Employer competes with other businesses that are or could be located in any part of the United States; and (d) the provisions of this Section 8 are reasonable and necessary to protect the Employer's business.

**8.2 Covenants of the Executive**  (a) In consideration of the acknowledgments by the Executive, and in consideration of the compensation and benefits to be paid or provided to the Executive by the Employer, the Executive covenants that he will not, directly or indirectly:

(i) during the Employment Period, except in the course of his employment hereunder, and during the Post-Employment Period, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by,

6

associated with, or in any manner connected with, lend the Executive's name or any similar name to, lend Executive's credit to or render services or advice to, any business whose activities compete in whole or in part with the products or activities of the Employer; provided, however, that the Executive may purchase or otherwise acquire up to (but not more than) one percent of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934;

(ii) whether for the Executive's own account or for the account of any other person, at any time during the Employment Period and the Post-Employment Period, solicit business of the same or similar type being carried on by the Employer, from any person known by the Executive to be a customer of the Employer, whether or not the Executive had personal contact with such person during and by reason of the Executive's employment with the Employer;

(iii) whether for the Executive's own account or the account of any other person (i) at any time during the Employment Period and the Post-Employment Period, solicit, employ, or otherwise engage as an employee, independent contractor, or otherwise, any person who is or was an employee of the Employer at any time during the Employment Period or in any manner induce or attempt to induce any employee of the Employer to terminate his employment with the Employer; or (ii) at any time during the Employment Period and for three years thereafter, interfere with the Employer's relationship with any person, including any person who at any time during the Employment Period was an employee, contractor, supplier, or customer of the Employer; or

(iv) at any time during or after the Employment Period, disparage the Employer or any of its shareholders, directors, officers, employees, or agents.

(v) the common stock will be sold by the Executive back to the company for $1.00 in the event the Executive violates either the non-compete or confidential provisions of this agreement.

(b) Notwithstanding the provisions of Section 8.2(a), in the event that Employer terminates this Agreement without "good cause" (as such term is defined in Section 6 hereof), Executive shall be entitled to contact and engage in business with the clients of Employer that Executive had primary responsibility for.

(c) For purposes of this Section 8.2, the term "Post-Employment Period" means the one (1) year period beginning on the date of termination of the Executive's employment with the Employer.

(d) If any covenant in this Section 8.2 is held to be unreasonable, arbitrary, or against public policy, such covenant will be considered to be divisible with respect to scope, time, and geographic area, and such lesser scope, time, or geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding, and enforceable against the Executive.

(e) The period of time applicable to any covenant in this Section 8.2 will be extended by the duration of any violation by the Executive of such covenant.

## 9. GENERAL PROVISIONS

**9.1 Injunctive Relief and Additional Remedy** The Executive acknowledges that the injury that would be suffered by the Employer as a result of a breach of the provisions of this Agreement (including any provision of Sections 7 and 8) would be irreparable and that an award of monetary damages to the Employer for such a breach would be an inadequate remedy. Consequently, the Employer will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement, and the Employer will not be obligated to post bond or other security in seeking such relief.

**9.2 Covenants of Sections 7 and 8** The covenants by the Executive in Sections 7 and 8 are essential elements of this Agreement, and without the Executive's agreement to comply with such covenants Employer would not have entered into this Agreement or employed or continued the employment of the Executive. If the Executive's employment hereunder expires or is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of the Executive in Sections 7 and 8.

**9.3 Representations and Warranties by the Executive** The Executive represents and warrants to the Employer that the execution and delivery by the Executive of this Agreement do not, and the performance by the Executive of the Executive's obligations hereunder will not, with or without the giving of notice or the passage of time, or both: (a) violate any judgment, writ, injunction, or order of any court, arbitrator, or governmental agency applicable to the Executive; or (b) conflict with, result in the breach of any provisions of or the termination of, or constitute a default under, any agreement to which the Executive is a party or by which the Executive is or may be bound.

**9.4 Binding Effect; Delegation of Duties Prohibited** This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective successors, assigns, heirs, and legal representatives, including any entity with which the Employer may merge or consolidate or to which all or substantially all of its assets may be transferred. The duties and covenants of the Executive under this Agreement, being personal, may not be delegated.

**9.5 Notices** All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and facsimile numbers set forth below (or to such other addresses and facsimile numbers as a party may designate by notice to the other parties):

8

**If to Employer:**
Metacom Corporation
100 Bayard Street
Suite 410
New Brunswick, NJ 08901

**If to the Executive:**
Mr. Daniel T. Fitzgerald
155 Devonshire Road
Wilmington, DE 19803

**9.6 Entire Agreement: Amendments**   This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, between the parties hereto with respect to the subject matter hereof. This Agreement may not be amended orally, but only by an agreement in writing signed by the parties hereto.

**9.7 Governing Law**   This Agreement will be governed by the laws of the State of New Jersey.

**9.8 Section Headings, Construction**   The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement unless otherwise specified. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

**9.9 Severability**   If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**9.10 Counterparts**   This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

9

**IN WITNESS WHEREOF,** the parties have executed and delivered this Agreement as of the date above first written above.

**METACOM CORPORATION**

By:_____

Name:  Todd M. Cohan

Title:  President

**EXECUTIVE**

_____

Daniel T. Fitzgerald        Date

10

# EXHIBIT "C"

Equity Interest in Metacom Technologies, Inc.

A 25% ownership interest is given by the board of directors and majority owners of Metacom Technologies, Inc., of New Brunswick, NJ to Daniel T. Fitzgerald, effective January 1, 2003.

This equity is represented by the stock certificates herewith. Daniel T. Fitzgerald owns the stock outright with all the capacities and privileges accompanying.

The issuance of additional equity certificates or other classes or categories of ownership cannot dilute the proportion of stock given herein.

Daniel T. Fitzgerald, his heirs, assigns or successors, may vote on corporate matters brought before the board of directors as a matter of course from time to time.

Daniel T. Fitzgerald may sell his interest at any time, to any entity of his choosing, so long as 90 days written notice is given to Metacom Technologies, Inc. Such written notice must clearly identify the person and entity making an offer, and include a copy of the executed offer, as well as the offer's legal representative. Metacom Technologies, Inc. reserves the right of first refusal for re-purchases of any and all shares of Metacom Technologies, Inc. held by Daniel T. Fitzgerald, and Daniel T. Fitzgerald must first offer to Metacom Technologies, Inc. at the same price contained in a bona fide offer from any third party. Likewise, Metacom Technologies, Inc., its Board of Directors and majority shareholders equally and individually agree to give a) 90 days written notice to Daniel T. Fitzgerald of the receipt from a third party making a bona fide, written offer to purchase shares. Such written notice must clearly identify the person and entity making an offer, and include a copy of the executed offer, as well as the offer's legal representative. Metacom Technologies gives Daniel T. Fitzgerald the right of first refusal to purchase a number of additional shares which if sold to a third party making a bona fide, written offer to purchase shares would result in that third party or parties controlling a majority of shares of Metacom Technologies, Inc.

Additional shares may be awarded to or purchased by Daniel T. Fitzgerald from time to time as the Board of Directors sees fit. Metacom Technologies, Inc. will prepare and provide Daniel T. Fitzgerald audited financial statements annually, at a minimum.

Todd Michael Cohan,
President, Chief Executive and Chairman

Date    2/11/04

Corporate Seal